IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JOE J. SALAZAR,

Plaintiff,

v.                                                                    Civ.  No. 04-404 JCH/WDS

ARTHUR HASSALL, BRYAN McOLASH,
SCOTT SPENCER, DEBRA GRIEGO,
DANETTE BURCH, JAMES C. JIMENEZ,
HAROLD FIELDS, JEFF VARELA,
individually and in their official capacities, and
NEW MEXICO DEPARTMENT OF FINANCE
AND ADMINISTRATION,

Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Plaintiff's Motion for Partial Summary

Judgment Regarding Section 1985 and Section 1986 Claims, filed October 26, 2006 **[Doc. No. 180]**,

Defendants' Combined Motion and Memorandum in Support of Motion for Summary Judgment, filed

October 26, 2006 **[Doc. No. 181]**,  Plaintiff's Motion and Memorandum of Law for Partial Summary

Judgment Regarding Discrimination and Retaliation, filed November 2, 2006 **[Doc. No. 187]**,

Plaintiff's Motion for Partial Summary Judgment Regarding Due Process Claims, filed November 2,

2006 **[Doc. No. 188]**, Plaintiff's Unopposed Motion for Leave to File Supplemental Response to

Defendant's Motion for Summary Judgment Nunc Pro Tunc, filed February 9, 2007 **[Doc. No. 210]**,

and Plaintiff's Motion for Leave to Amend the Complaint, filed February 9, 2007 **[Doc. No. 211]**.

The Court, having considered the motions, memoranda, and relevant law, and being otherwise fully

informed, finds that Plaintiff's Motion for Partial Summary Judgment Regarding Section 1985 and

Section 1986 Claims is not well taken and will be denied, Defendants' Combined Motion and Memorandum in Support of Motion for Summary Judgment is well taken and will be granted, Plaintiff's Motion and Memorandum of Law for Partial Summary Judgment Regarding Discrimination and Retaliation is not well taken and will be denied, Plaintiff's Motion for Partial Summary Judgment Regarding Due Process Claims is not well taken and will be denied, Plaintiff's Unopposed Motion for Leave to File Supplemental Response to Defendant's Motion for Summary Judgment Nunc Pro Tunc is well taken and will be granted, and Plaintiff's Motion for Leave to Amend the Complaint is not well taken and will be denied.

## **BACKGROUND**

I.     Procedural Background.

Plaintiff Salazar filed his First Amended Complaint on April 21, 2004, alleging the following claims:  (1) conspiracy to violate his civil rights under 42 U.S.C. Section 1985 (Count I); (2) denial of his Constitutional rights to substantive and procedural due process, in violation of the Fourteenth Amendment and 42 U.S.C. Section 1983 (Count II); (3) discrimination on the basis of race in violation of Title VII as well as denial of his Constitutional right to equal protection under 42 U.S.C. Section 1983 (Count III); (4) discrimination on the basis of age in violation of the Equal Protection Clause and 42 U.S.C. Section 1983, as well as discrimination on the basis of age in violation of the Age Discrimination in Employment Act ("ADEA"), Title VII, and the New Mexico Human Rights Act ("NMHRA") (Count IV); and (5) prima facie tort (Count V).

On February 22, 2005, and on February 14, 2006, the Court dismissed some of the claims against certain Defendants.  After those dismissals, Plaintiff Salazar's remaining claims are as follows: (1) injunctive (but not monetary) claims for conspiracy to violate civil rights under 42 U.S.C. Section

2

1985 against the individual defendants in their official capacities; (2) monetary and injunctive claims for conspiracy to violate civil rights under 42 U.S.C. Section 1985 against the individual defendants in their individual capacities; (3) injunctive (but not monetary) claims for violation of the right to substantive and procedural due process pursuant to 42 U.S.C. Section 1983 against the individual defendants in their official capacities; (4) monetary and injunctive claims for violation of the right to procedural due process against Defendant Varela in his individual capacity; (5) monetary and injunctive claims for violation of the right to substantive due process against Defendants Hassall, McOlash, Spencer, Griego, Burch, Jimenez, and Fields in their individual capacities; (6) injunctive (but not monetary) claims for race discrimination in violation of the Equal Protection Clause pursuant to 42 U.S.C. Section 1983 against the individual defendants in their official capacities; (7) monetary and injunctive claims for race discrimination in violation of the Equal Protection Clause pursuant to 42 U.S.C. Section 1983 against Defendants Hassall, McOlash, Spencer, Griego, Burch, Jimenez, and Fields in their individual capacities; (8) monetary and injunctive claims for race discrimination in violation of Title VII against Defendant NMDFA; (9) injunctive (but not monetary) claims for age discrimination in violation of the Equal Protection Clause pursuant to 42 U.S.C. Section 1983 against the individual defendants in their official capacities; (10) monetary and injunctive claims for age discrimination in violation of the Equal Protection Clause pursuant to 42 U.S.C. Section 1983 against the individual defendants in their individual capacities; (11) monetary and injunctive claims for age discrimination in violation of Title VII against Defendant NMDFA; (12) claims for age discrimination in violation of the ADEA against Defendant NMDFA and the individual defendants in their individual and official capacities, and (13) a claim for age discrimination in violation of the NMHRA against Defendant NMDFA.

II.    <u>Factual Background</u>.[1]

On March 4, 2002, Plaintiff Salazar was hired by Defendant New Mexico Department of Finance Administration (NMDFA). At the time of his hire, Plaintiff Salazar had the working title of Deputy Director, which was not an official state personnel position. Plaintiff Salazar's official position was General Manager of the Administrative Services Division (ASD). Defendant NMDFA terminated Plaintiff Salazar from his employment on May 23, 2003. Plaintiff Salazar had been employed by the State of New Mexico for 22 years prior to his termination.

A.    <u>Conflict Regarding Former ASD Director Ortiz</u>.

At the time the NMDFA hired Plaintiff Salazar, Lillie Mae Ortiz was serving as the Director of ASD. On May 1, 2002, Ortiz retired from her position as ASD Director, but returned to ASD one week later as a contractor, occupying the same office she had used as a full-time employee. Thereafter, Plaintiff Salazar was appointed Acting Director of ASD.

Defendant Hassall was the Human Resources Director at the NMDFA from 1992 to 2003. Defendant Hassall had a ten-year history of conflict with Ortiz. Defendant Hassall was very upset that Ortiz returned to her former office at the NMDFA and continued to act as the Director of the ASD after her retirement. On May 8, 2002, Defendant Hassall filed a complaint with Plaintiff Salazar against Ortiz. In his complaint, Defendant Hassall objected to the fact that Ortiz continued to act as Hassall's supervisor. Plaintiff Salazar did not take any action with respect to the complaint. Rather, Salazar referred Hassall to Defendant Cabinet Secretary Fields. Defendant Hassall became upset with Plaintiff Salazar and accused Salazar of being hostile. Defendant Hassall became more upset with Plaintiff when Plaintiff prevented Hassall from hiring a job applicant without interviewing higher

---

[1] The following facts are either undisputed or construed in Plaintiff's favor.

4

ranked applicants.

Defendant Hassall complained to Defendant Spencer, General Counsel of the NMDFA, about Plaintiff Salazar's refusal to remove Ortiz from her office. Defendant Spencer approached Plaintiff Salazar in Salazar's office to discuss Ortiz. Salazar referred Defendant Spencer to Defendant Fields. Defendant Fields  happened to be walking by, and Salazar called Fields into his office. Defendant Fields listened to Spencer's complaint, and Fields indicated that he would inform employees that Plaintiff Salazar was the Acting Director of ASD and that Ortiz no longer had any supervisory authority. After Defendant Fields left Salazar's office, Defendant Spencer said "[t]his isn't over" to Plaintiff.

      B.     <u>Complaints Against Plaintiff Salazar</u>.

In early June 2002, Victoria Jaramillo, a co-worker of Defendant Hassall's in the Human Resources Department, told Hassall that Plaintiff Salazar had made an offensive comment about her hair. Defendant Hassall informed Defendant Spencer of Jaramillo's complaint. Defendant Hassall also informed Defendant Spencer that Plaintiff Salazar's personnel file contained information about a previous reprimand Plaintiff Salazar had received for inappropriate comments to subordinates at another state agency. Plaintiff Salazar had responded to that charge by claiming that he did not intend for his comments to be derogatory and that he was merely "joking around" with his staff. His former state employer had counseled him as follows: "It is apparent that your 'joking around' has offended these two employees[;] therefore I am directing you to refrain from any type of derogatory statements toward them or any other employee during the work day. While you may think you are 'joking around' others may not think you are joking and may take offense to your comments." Defendants Hassall and Spencer spoke to Plaintiff Salazar's co-workers and collected three additional written

complaints from women regarding offensive comments made by Salazar.

Grievances by NMDFA employees against other NMDFA employees are processed and controlled by NMDFA's grievance/complaint procedure. The NMDFA grievance policy provides that "an attempt must be made to resolve a problem informally before it is presented in writing as a Formal Grievance/Complaint." The grievance procedure further provides that an "employee must verbally or in writing notify the DFA EEO Officer of an Informal Grievance/Complaint within thirty (30) calendar days of the event or latest event in a series of events giving rise to the[] grievance/complaint." The grievance policy also states,

> [I]f the grievance/complaint is not satisfactorily resolved through the Informal Grievance procedure, within twenty (20) days of receiving notification, the EEO Officer will issue a dated statement to the employee indicating the Informal Grievance/Complaint has not resulted in resolution, and informing the employee that he/she may proceed to the Formal Grievance. The employee must present the Formal Grievance/Complaint in writing to the EEO Officer and division director (or deputy cabinet secretary if the grievance concerns the division director) within five (5) working days after the EEO Officer's dated statement.

The policy further provides that nothing within the procedures shall preclude an employee from filing charges of discrimination with any state or federal enforcement agency.

Plaintiff Salazar was not given an opportunity to resolve the complaints against him informally. Plaintiff Salazar would have resolved the complaints informally because he did not know anyone was offended by his comments, he did not intend to offend anyone, he was joking when he made the comments, and he believed that his co-workers knew he was joking.

On June 24, 2002, Plaintiff Salazar attended a meeting with Defendant Cabinet Secretary Fields, at which time Fields presented Salazar with the facts forming the basis of the women's

complaints.  Plaintiff Salazar admitted these facts.  Defendant Fields gave Plaintiff Salazar a formal letter of written reprimand, with attached memoranda setting forth the substance of the women's complaints, and informed Salazar that he was suspending his supervisory authority for 30 days. Plaintiff Salazar was not given an opportunity to review the attached memoranda during the meeting. Salazar did, however, take the letter of reprimand and attached memoranda to his office and read them carefully.  Neither the complaining women nor Defendants referred the complaints to the NMDFA's EEO Officer.  Defendant Fields testified that it was his decision to reprimand Plaintiff Salazar for the inappropriate comments.  Defendant Fields relied upon Defendant Spencer, the NMDFA's General Counsel, to give him advice with respect to the procedures for reprimanding a state employee.  After Defendant Fields gave Plaintiff Salazar this written reprimand, there were no additional complaints against Plaintiff Salazar regarding inappropriate comments to women.

Plaintiff Salazar maintains that the complaints against him were processed differently from a grievance against Chris Hoffman, a Caucasian employee at the NMDFA.  In his affidavit, Plaintiff Salazar states that "[w]hile employed at NMDFA, I understood that a female employee at NMDFA complained that Chris Hoffman, a White employee[,] held her by the shoulders and shook her in an angry manner," and that Hoffman was not disciplined.[2]

---

[2] Defendants argue that this statement constitutes double hearsay.  Plaintiff Salazar's "understanding" does not necessarily constitute a "statement" within the meaning of the hearsay rule, because an "understanding" could be something other than "an oral or written assertion" or "nonverbal conduct . . . intended . . . as an assertion."  Fed. R. Evid. 801(a).  The female employee's complaint, however, does constitute a "statement."   Although Plaintiff Salazar uses the word "complain" instead of "said" or "stated," if an employee has "complained" that misconduct occurred, the complaint is either an oral or written assertion or nonverbal conduct intended as an assertion.  *Id.* Although the female employee's complaint constitutes a "statement," that statement is not hearsay because it is not offered "in evidence to prove the truth of the matter asserted."  *Id.* 801(c).  Plaintiff Salazar is not attempting to prove that Chris Hoffman actually held the female employee by the shoulders and shook her in an angry manner.  Rather, Plaintiff Salazar seeks only to establish that the

C.     Plaintiff Salazar's June 25, 2002, Letter.

In a June 25, 2002, letter to Defendant Cabinet Secretary Fields, Plaintiff Salazar alleged that Defendants Spencer and Hassall were discriminating against him.  Plaintiff Salazar indicated that he "would like to point out some brief facts, which have been brought, to [his] attention and also to an incident that [he] was part of."  Plaintiff Salazar then referenced the encounter regarding Ortiz that he had with Defendants Hassall and Spencer in his office, a statement by Ortiz that Defendant Spencer encouraged her not to discipline Defendant Hassall, and the fact that Salazar did not request additional compensation when he was given the assignment of Acting Director.  Plaintiff Salazar then stated,

> I strongly feel that I am being discriminated for these incidents while others seem to display their questionable behavior more than once without being reprimanded either formally or informally.  The other two gentlemen, who have Anglo surnames, and I, of Hispanic surname, are being treated significantly different.  I also feel that Mr. Spencer is taking this opportunity to retaliate against me for the incident I mentioned above.  Why is it that Mr. Spencer advises Ms. Ortiz not to follow through with the written reprimands against Mr. Hassall but yet advises you to write and place a letter of reprimand in my personnel file?

Plaintiff Salazar closed his letter by stating that he would "be seeking legal advise and follow through with appropriate actions based on the above information and my right to equal employment opportunity."   Plaintiff Salazar did not pursue the matter further with the NMDFA's EEO Officer and did not file a charge of discrimination with the United States Equal Employment Opportunity Commission (EEOC) or the New Mexico Human Rights Division.

Defendant General Counsel Spencer provided legal advise to Defendant Fields regarding

---

female employee made such a complaint (regardless of its truth), and that Defendants treated this complaint against Hoffman differently from the complaints against Plaintiff Salazar.

Plaintiff Salazar's June 25, 2002, letter despite being named as one of the two individuals against whom Salazar was complaining.  Defendant Fields did not investigate or take any other action with respect to Salazar's letter.

   D. <u>Permanent Removal of Plaintiff Salazar's Supervisory Authority</u>.

   On July 23, 2002, Defendant Fields decided to remove Plaintiff Salazar's supervisory authority permanently.  Although Defendant Fields removed Plaintiff Salazar's supervisory authority permanently, Fields did not reduce Plaintiff Salazar's salary.

   Defendant Fields's decision to remove Salazar's supervisory authority permanently was based upon Salazar's lack of remorse as shown by his June 25, 2002, letter.  His decision also was based on the women's complaints, Plaintiff Salazar's history of inappropriate comments at a previous state agency, and Fields's belief that there was too much risk in having Salazar in a management position. Defendants did not give Plaintiff Salazar a Notice of Contemplated Action or an opportunity to be heard prior to Defendant Fields's decision permanently to remove Salazar's supervisory authority.

   E. <u>Plaintiff Salazar's Job as Audit Coordinator</u>.

   Without supervisory authority, Plaintiff Salazar could no longer serve as Acting Director of ASD.  On July 1, 2002, Defendant McOlash was appointed Acting Director of ASD.  On July 12, 2003, Defendant McOlash asked Plaintiff Salazar to assume the function of Audit Coordinator.  As Audit Coordinator, Plaintiff Salazar was responsible for the coordination of the preparation of the Fiscal Year 2002 NMDFA audit.

   The pay band for a General Manger sets the maximum annual salary at $80,600.  The pay band for a Financial Controller Advanced (*e.g.*, Plaintiff Salazar's position as Audit Coordinator) sets the maximum annual salary at $66,712.  These maximum salaries were not effective until January 3,

2004, when Plaintiff no longer was employed by the NMDFA.

The removal of Plaintiff Salazar's supervisory authority and reclassification from General Manager to Financial Coordinator Advanced effectively placed Salazar in a lower pay band. When Defendant Fields removed Plaintiff Salazar's supervisory authority permanently, Salazar's job title should have been reclassified from General Manager to a technical job classification. Defendants, however, did not officially place Plaintiff Salazar in a lower pay band or change Salazar's job classification from General Manager to a technical classification. Defendants likewise did not reduce Salazar's salary when he was appointed Audit Coordinator. Although Defendant Fields had instructed Defendant Hassall to reclassify Plaintiff Salazar, Hassall did not reclassify Salazar because it was Defendant McOlash's responsibility to submit proper documentation to the State Personnel Office but McOlash failed to do so. Defendants did not officially reclassify Plaintiff Salazar to a technical job classification until March 28, 2003.

Plaintiff Salazar's relationship with Defendant McOlash "broke down." On September 26, 2002, Plaintiff Salazar sent Defendant McOlash an e-mail requesting assistance in obtaining information. Defendant McOlash forwarded Plaintiff Salazar's e-mail to Defendant General Counsel Spencer stating, "I am sending a couple of these for your amusement. I will carefully save the expected flood. This has the feel of a ridiculous acceleration."

Defendant McOlash came to the conclusion that Plaintiff Salazar's overall work performance was unsatisfactory. It is unclear whether Defendant McOlash communicated this dissatisfaction to Plaintiff Salazar. McOlash sent Plaintiff an October 9, 2002, memorandum, in which McOlash stated,

> Your most recent email to me borders on insubordination. Once again, you have blamed me and other staff for your inability or unwillingness to perform your duties in a cooperative manner . . . . It

10

is apparent from your defensive accusatory tone that you have no intention of becoming a 'team player' and contributing to the agency mission. . . .  There can be no doubt that I will consider your attitude and demeanor, along with your substantive work performance, when evaluating you.

Defendant McOlash did not send the memorandum in response to substantive problems with Salazar's work but rather in response to Salazar's e-mail questioning McOlash's selective enforcement of the requirement of a doctor's excuse.  Defendant ASD Director McOlash gave Salazar 139 hours of compensatory time in 2002 because "Plaintiff had worked hard and put in the time."

Plaintiff Salazar completed the NMDFA's Fiscal Year 2002 audit on time, with six audit findings, and with an unqualified opinion.  Defendant Fields testified that Salazar "did a reasonable job on the audit."  Although Defendant Fields was "very disconnected from the audit" and had "no knowledge" of Plaintiff Salazar's "specific daily performance," Defendant Fields explained that NMDFA did a "reasonable job on the audit" and that Salazar was involved in the audit, "so he had a piece in . . . the success of it."

As Acting Director of ASD, Defendant McOlash had the administrative responsibility for ensuring that the Fiscal Year 2002 audit was completed on time.  Defendant Fields testified that McOlash "had overall responsibility for the administrative services, and he would have . . . had as much responsibility for the audit as anybody."  Defendant McOlash had no experience or training in preparing audits.

In January 2003, Governor Bill Richardson took office and Richardson's administration replaced Defendant McOlash with Defendant Debra Griego, who became Director of ASD.  Defendant Griego asked Defendant McOlash to evaluate the people he had supervised, including Plaintiff Salazar, during his tenure as Acting Director of the ASD.  On January 23, 2003, Defendant

McOlash gave Plaintiff Salazar an unsatisfactory performance appraisal. Defendant General Counsel Spencer reviewed McOlash's appraisal of Salazar. Plaintiff Salazar was the only NMDFA employee to whom Defendant McOlash gave an overall unsatisfactory appraisal after the Fiscal Year 2002 audit. Prior to January 2003, Plaintiff Salazar had never received an unsatisfactory performance appraisal while employed by the State of New Mexico. Defendant McOlsah was not given an unsatisfactory appraisal for completing the NMDFA Fiscal Year 2002 audit on time and with an unqualified opinion.

      F.    <u>Plaintiff Salazar's Formal Grievance</u>.

After Plaintiff Salazar received his unsatisfactory evaluation, Salazar advised Defendant Griego, the newly-appointed ASD Director, that he had many technical skills and was an asset to the NMDFA. Defendant Griego decided that she and Plaintiff Salazar would develop a new PAD for him and that she would give Salazar a clean slate and re-evaluate him in 90 days.

On February 21, 2003, approximately one month after the new administration came in, Plaintiff filed a formal grievance against Defendants Jimenez (who replaced Defendant Fields as Cabinet Secretary), Griego, Spencer, McOlash, and Hassall, alleging discrimination and a "hostile environment." Specifically, Plaintiff Salazar stated, "The performance evaluation that was recently given to me by Mr. McOlash, Ms. Griego, and Mr. Hassall is defaming and discriminating. The response of Mr. Jimenez's memorandum that I am leaving in May and limited time remaining with DFA threatens my job security." Plaintiff Salazar requested that he "be removed immediately from [this] hostile environment."

In a memorandum dated February 24, 2003, Defendant Hassall lodged a counter-grievance against Plaintiff Salazar, indicating, with respect to Plaintiff Salazar's request to be removed from the

allegedly hostile environment, that Defendant NMDFA should inform him if there is anything he can do "to expedite Mr. Salazar's request for removal from this workplace." Defendant Hassall stated that Plaintiff Salazar created an environment that was hostile in 2003 by his mere presence at the NMDFA.

Defendant Burch, who served as Deputy Cabinet Secretary for Budget and Policy in Defendant Cabinet Secretary Jimenez's Office, processed Plaintiff Salazar's formal grievance. Defendant Burch has a Bachelor's Degree in accounting from New Mexico State University, and prior to working at the NMDFA, she performed audit work for eight and one-half years at the State Auditor's Office. As part of her investigation, Defendant Burch notified Defendants Spencer, McOlash, Hassall, and Griego of the formal grievance and requested responses from them. These Defendants filed responses to Plaintiff's formal complaint. Defendant Burch also telephoned several persons to learn more about certain issues.

Defendant Burch denied Plaintiff Salazar's formal grievance on March 18, 2002, determining that Salazar's January 23, 2003, evaluation was fair and was "based on observation and the result of job related behavior" as required by the New Mexico State Personnel Board (SPB). Defendant Burch further concluded that "there [was] no evidence that the PAD process and specifically the meeting between [Salazar], Ms. Griego, Mr. Hassall and Mr. McOlash was discriminatory or defaming." She further stated that the "formal Grievance presents no statements or behavior supporting [Salazar's] claim of discrimination or defamation." Defendant Burch informed Plaintiff Salazar that he could appeal the denial to (the recently-appointed) Cabinet Secretary Jimenez, who was a named respondent in Plaintiff Salazar's grievance. Defendant Burch did not provide Plaintiff Salazar with copies of the responses of Defendants Spencer, Griego, McOlash, or Hassall or allow Salazar to reply to the

responses of these Defendants.  Defendant Burch did not notify or request a response from Defendant

Jimenez, and Defendant Jimenez did not provide a response.

In an April 17, 2003, letter Plaintiff Salazar stated, "I have read the letter from Ms. Dannette

Burch [denying the grievance], and . . . I have no recourse but to follow through to finding

employment outside this agency."  Plaintiff Salazar then refuted some of the criticism against him and

stated, "This is all I would like to say for now on this matter.  But I want to assure you that I will give

the Department my best effort on all job duties assigned, as long as they are within reason."

Defendant Jimenez did not respond to Plaintiff Salazar's letter because he did not believe the

letter constituted an appeal.  Defendant General Counsel Spencer advised Defendant Jimenez on the

formal grievance process despite the fact that Salazar named Spencer as a respondent in his grievance.

G.      The March 28, 2003, Voluntary Reduction Without Loss in Salary Agreement.

Beginning in March 2003, Defendant Griego began to remove Salazar's job responsibilities

"so that all he had to do was focus on [drafting policies and procedures]."    That same month, Plaintiff

Salazar was presented with a "Voluntary Reduction Without Loss in Salary Agreement."  Plaintiff

Salazar took the Agreement home, read it, and returned it signed and without any immediate protest.

Plaintiff Salazar was not given any option other than signing the Voluntary Reduction Agreement.

On the bottom of Salazar's copy of the Voluntary Reduction Agreement, Salazar hand wrote the

following note:  "I requested to have a witness at this meet[ing] but was denied by Ms. Griego, all

though [sic] she had Mr. Anthony Armijo, Director Financial Control Division.  The implication if

I did not sign this document at this time that there would be reprisal taken against me."  The

handwritten note is dated March 28, 2003.  Defendants did not see a copy of the version of the

Agreement with the handwritten note until after Plaintiff Salazar filed his SPB action.

Prior to signing the Voluntary Reduction Agreement, Plaintiff Salazar had been in a General Manager position. The voluntary reduction officially placed Salazar in a technical non-management category with a title of Financial Coordinator A. The Reduction Agreement did not reduce Salazar's pay.

H.    Chief Financial Officer Position.

New Mexico State Auditor Archibeque considered Plaintiff Salazar to be the Chief Financial Officer at ASD. Archibeque, who was outside of the NMDFA, had no involvement or responsibility over the day-to-day management activities or the personnel decisions of the ASD, and he was unfamiliar with job duties and job descriptions of NMDFA personnel.

Pursuant to new legislation passed by the New Mexico state legislature, the NMDFA was required to have a Chief Financial Officer. In March 2003, Defendant Griego initiated a change in the Chief Financial Officer job description, such that the newly-defined position required an applicant to be a certified public accountant. Plaintiff Salazar is not a certified public accountant.    In March 2003, Defendant NMDFA began the process of advertising and interviewing candidates for Chief Financial Officer. On May 7, 2003, Defendant Griego hired a Caucasian woman, younger than Plaintiff Salazar, to serve as Chief Financial Officer.

After NMDFA hired the Chief Financial Officer, the Fiscal Year 2003 audit was completed late and with sixteen audit findings, and the Fiscal Year 2004 audit was completed late and with sixteen audit findings. The Chief Financial Officer was not given an unsatisfactory appraisal despite being late in filing the Fiscal Year 2003 and Fiscal Year 2004 audits and despite receiving twice as many audit findings as the Fiscal Year 2002 Audit, which was completed during Plaintiff Salazar's tenure as Audit Coordinator.

15

I.      Plaintiff Salazar's Termination.

Defendant Griego concluded that Salazar's job performance had not improved, and that although Plaintiff Salazar had signed a new PAD for his work, Salazar did not have a global perspective or "a hand on" what needed to be done.  On May 14, 2003, Defendant Griego gave Plaintiff Salazar an unsatisfactory quarterly review.  That same day, Defendant Griego prepared a Notice of Contemplated Action and provided Plaintiff Salazar with that Notice.  This was the second consecutive unsatisfactory review within a four-month period that Plaintiff Salazar received.  The second review was given to Plaintiff Salazar by a new supervisor recently appointed by a new administration.

The Notice of Contemplated Action sets forth nine paragraphs asserting the reasons for the contemplated dismissal followed by this statement: "You have seven calendar days from service of this notice to respond in writing to the notice or to request an opportunity for an oral response." Defendant General Counsel Spencer advised Defendant Griego with respect to the Notice of Contemplated Action.

Plaintiff Salazar admits in his Amended Complaint that he did not respond to the Notice and alleges that the vagueness of the Notice prevented him from doing so.  In a memorandum dated May 21, 2003, seven days after the Notice was issued, Plaintiff Salazar requested documents from Defendant Jimenez.  In the memorandum, Plaintiff Salazar states, "Please provide the following documentation so we can proceed with our own investigation on this personnel matter.  Please have this information available to Mr. Salazar three working days after he has presented this request to you."  On May 23, 2003, Defendant Griego responded to the request, stating that the NMDFA "consider[s] [the] request to be separate and distinct from [Salazar's] right to inspect documents in

16

support of [his] pending disciplinary action, which have already been provided to you." Defendant Griego informed Plaintiff Salazar that the documents would not be available for his inspection until June 4, 2003.

That same day, on May 23, 2003, Defendants Griego and Jimenez gave Plaintiff Salazar a Final Notice of Contemplated Action. Defendants informed Salazar that the NMDFA would place Salazar on administrative leave until May 28, 2003, when his dismissal would be effective. Defendant General Counsel Spencer advised Defendants with respect to Plaintiff Salazar's request for documents.

Plaintiff Salazar admitted in his deposition that he requested an opportunity to make an oral response to the Notice of Contemplated Action, and that he received the opportunity to make that response to Defendant Secretary Jimenez. That meeting took place after Plaintiff Salazar received the Notice of Contemplated Action and before he received the Notice of Final Action.

The position of Audit Coordinator was not eliminated after the NMDFA terminated Plaintiff Salazar. Defendant Griego wanted to advertise for Plaintiff Salazar's position, which Defendant Griego referred to as a Financial Coordinator position, because May was a critical time and the NMDFA needed to hire someone. Defendant NMDFA hired a woman for the Financial Coordinator position. Defendant NMDFA did not fill the specific position of Audit Coordinator after Plaintiff Salazar was terminated. Defendant Griego and others performed the tasks that had been within the job responsibilities of the Audit Coordinator.

      J.      <u>State Personnel Board Findings</u>.

Plaintiff Salazar filed a Notice of Appeal to the SPB contesting his dismissal and requesting a hearing with an administrative law judge designated by the SPB. Defendant Jeff Varela is the

Director of the New Mexico State Personnel Office.  The SPB designated Administrate Law Judge

Padilla to hear Salazar's appeal, and the hearing took place on May 26, 27, and 28, 2004.  In the SPB

proceeding, Plaintiff Salazar took the position that Defendant NMDFA did not have sufficient cause

to terminate his employment.  Plaintiff Salazar was permitted to subpoena witnesses, serve

interrogatories and requests for documents, give an opening statement, submit documentary exhibits,

examine and cross-examine witnesses, and make a closing argument.

On February 1, 2005, Administrative Law Judge Padilla issued his final decision, in which he

determined  that (1) Plaintiff Salazar made inappropriate remarks to female employees under his

supervision, (2) Plaintiff Salazar's inappropriate remarks constituted misconduct, (3) Plaintiff Salazar

was hostile and uncooperative toward his supervisor Defendant ASD Director McOlash and this

attitude was inconsistent with Salazar's obligations to the NMDFA, (4) Plaintiff Salazar failed to

satisfactorily perform his duties as audit coordinator, (5) Plaintiff Salazar failed to complete job

assignments, (6) Plaintiff Salazar had trouble working with others and blamed others, (7) Plaintiff

Salazar was unwilling to cooperate with management to ensure proper functioning of the ASD, (8)

Plaintiff Salazar was uncooperative and defensive with certain co-employees and at least one outside

contractor, (9) Plaintiff Salazar failed to reconcile accounts properly, (10) Plaintiff Salazar failed to

recognize and understand the organizational hierarchy of the ASD, (11) Plaintiff Salazar showed no

enthusiasm, did not take the lead on assigned tasks, and had to be prodded by his supervisor, (12)

Plaintiff Salazar gave work assignments to others without authority, (13) Plaintiff Salazar's

performance continued to be unsatisfactory after being given a reasonable opportunity to correct it,

(14) Plaintiff Salazar was hostile to his supervisor, Defendant Griego, (15) Plaintiff Salazar was

hostile to Defendant Hassall, (16) Plaintiff Salazar was hostile to, and refused to work with, a

contractor, (17) Plaintiff Salazar refused to work with several co-employees, (18) Plaintiff Salazar's hostility toward his supervisors and co-employees was inconsistent with his obligations to the NMDFA, (19) Plaintiff Salazar was incompetent to fully carry out his assigned duties, (20) Plaintiff Salazar was insubordinate, (21) Plaintiff Salazar was inefficient due to his hostile and uncooperative attitude, and (22) Plaintiff Salazar's work performance was unsatisfactory.

Plaintiff Salazar appealed the decision of the State Personnel Office and Administrative Law Judge Padilla to the State of New Mexico First Judicial District Court on February 16, 2005.

K.    Exhaustion of Administrative Remedies.

On June 9, 2003, Plaintiff Salazar filed a Charge of Discrimination with the EEOC, wherein he asserted that he had received an unsatisfactory evaluation in January 2003 and a demotion from Deputy Director to Financial Coordinator.  Plaintiff Salazar claimed that his evaluation and the alleged demotion were unlawful employment practices based upon his age and national origin. Plaintiff Salazar's EEOC Charge did not include any reference to the fact that he had been terminated and it did not reference retaliation.

The EEOC investigated Plaintiff Salazar's claims of discrimination pursuant to the "Statement of Harm" attached to the Charge of Discrimination.  As part of its investigation, the EEOC asked Defendant NMDFA to respond to Salazar's claims.  Defendant Griego responded by stating that Salazar had failed to advise the EEOC of "several important facts," including the fact that Salazar had been re-evaluated by a different supervisor (Defendant Griego, who had just been appointed Director of the ASD in January 2003) three months after his January 2003 evaluation, that his performance was rated unsatisfactory a second time by that different supervisor, and that he subsequently was terminated.  Defendant Griego enclosed supporting documentation for the EEOC's review.

After receiving the NMDFA's response, the EEOC sent Plaintiff Salazar a letter dated December 23, 2003, confirming that Salazar's charge was that he had received an unsatisfactory performance evaluation in January 2003 and that he was demoted, and that these actions were based upon the discriminatory motives of age and national origin.  The EEOC's letter further stated, "If you wish to provide any further information for consideration by the Enforcement Manager prior to the issuance of a determination, you must submit this information in writing so that it is received in this office by close of business January 5, 2004."

In a letter dated January 13, 2004, "[Plaintiff] respond[ed] to [the EEOC's] letter dated December 23, 2003," by mentioning, but not discussing, Salazar's termination, the loss of his supervisory authority, and the allegedly hostile work environment created by Defendants McOlash and Griego.  The letter did not indicate that Plaintiff Salazar was amending his Charge of Discrimination to include the termination as an unlawful discriminatory practice or retaliation.  On January 15, 2003, the EEOC Enforcement Manager mailed a Right to Sue Letter to Plaintiff Salazar.

Plaintiff Salazar failed to request and receive an Order of Non-Determination from the New Mexico Human Rights Division prior to the time he filed his response to Defendants' Motion for Summary Judgment.  Plaintiff Salazar indicated in his response, however, that he had requested an Order of Non-Determination from the Division and that he would supplement his response upon receipt of that Order.  On February 9, 2007, Plaintiff Salazar filed a Motion for Leave to File Supplemental Response to Defendant's Motion for Summary Judgment Nunc Pro Tunc seeking to introduce a copy of the Order of Non-Determination that he recently had received from the Division.

## **STANDARD**

Summary judgment generally is appropriate when a court determines that "'there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law.'" *Thrasher v. B & B Chem. Co.*, 2 F.3d 995, 996 (10th Cir. 1993) (citation omitted). Under Rule 56(c), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the movant will not bear the burden of proof at trial, this burden may be met by pointing to "a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 325). Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

Upon a motion for summary judgment, a court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co.*, 985 F. Supp 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). If there is no genuine issue of material

21

fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law. *See, e.g.*, *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

The standard for analyzing a motion for summary judgment shifts slightly if, as here, a defendant raises qualified immunity as a defense in a suit under 42 U.S.C. Section 1983. Qualified immunity bars Section 1983 suits against defendants in their individual--but not official--capacities. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 167 (1985) (citations omitted). Once a moving party raises the defense of qualified immunity, the nonmoving party must (1) assert facts which, if true, would constitute a violation of a constitutional right, and (2) demonstrate that the "right was clearly established at the time such that a reasonable person in the [movant's] position would have known that [the] conduct violated the right." *Garramone v. Romo*, 94 F.3d 1446, 1449 (10th Cir. 1996) (citations omitted); *see also, e.g., Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). If a nonmoving party fails to satisfy this two-part burden, a court must grant the moving party qualified immunity. *See Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

## DISCUSSION

I.  Defendants' Motion for Summary Judgment on Plaintiff Salazar's Title VII and NMHRA Claims on the Ground of Failure to Exhaust Administrative Remedies and Plaintiff's Motion for Leave to File Supplemental Response to Defendants' Motion for Summary Judgment.

A plaintiff generally must exhaust his or her administrative remedies before pursuing a claim under Title VII or the NMHRA. *Khader v. Aspin*, 1 F.3d 968, 970 (10th Cir. 1993); N.M. Stat. Ann. §§ 28-1-1 *et seq.* Exhaustion of administrative remedies is central because it provides an administrative agency with the first opportunity to investigate discriminatory practices and enables the agency to perform its roles of obtaining voluntary compliance and promoting conciliatory efforts.

*Patterson v. McLean Credit Union*, 491 U.S. 164, 180-81 (1989) (superseded in part by statute on other grounds); *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 222 (8th Cir. 1994). To exhaust administrative remedies, an individual claimant must timely file a Charge of Discrimination setting forth the facts and nature of the charge with the EEOC or the New Mexico Human Rights Division and receive notice of the right to sue. *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999); 42 U.S.C. § 2000e-5(b), (c), (e), (f)(1); *Mitchell-Carr v. McLendon*, 127 N.M. 282, 980 P.2d 65 (N.M. 1999). Furthermore, a claimant must file a charge for each discrete discriminatory act within the time limit after it occurs, which here is 300 days from the date of the act, or lose the ability to recover for it. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109-10 (2002); *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003). "Exhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII" or the NMHRA. *Jones v. Runyon*, 91 F.3d 1398, 1399 (10th Cir. 1996). Without such a filing, a federal court lacks subject matter jurisdiction to entertain a Title VII or NMHRA claim.

Defendants maintain that Plaintiff Salazar failed to exhaust his remedies with respect to his NMHRA claim because he did not obtain the right to sue from the New Mexico Human Rights Division. New Mexico courts consistently have held that "full compliance with NMHRA grievance procedures [is] a prerequisite to filing [an NMHRA] claim in district court." *Mitchell-Car v. McLendon*, 127 N.M. 282, 287, 980 P.2d 65, 72 (N.M. 1999) (citations omitted). A plaintiff satisfies these prerequisites by obtaining an Order of Non-Determination from the Division and appealing that Order within thirty days. *Id.* The work-sharing agreement between the EEOC and the Division "contemplates dual filed charges but not a shared solution of those charges." *Id.* In other words, "receiving a notice of right to sue from the EEOC does not satisfy the state law requirement of

23

obtaining an order [of non-determination] from the Division." *Id.* at 286. "[T]he timely filing of a notice of appeal from an NMHRA administrative order [of non-determination] is 'effective to give the district court jurisdiction to try the case de novo' under Section 28-1-13." *Id.* (quoting *Linton v. Farmington Mun. Schs.*, 86 N.M. 748, 750, 527 P.2d 789, 791 (1974)). "On the other hand, the district court must dismiss an NMHRA claim if the prerequisites of obtaining an order from the Division and appealing that order within thirty days are not satisfied." *Id.* (citation omitted).

There is no evidence in the record presently before the Court indicting that Plaintiff Salazar received an Order of Non-Determination from the New Mexico Human Rights Division. At the time of his initial response to Defendants' Motion for Summary Judgment, Plaintiff Salazar indicated that he had requested an Order of Non-Determination from the Division and that he would supplement his response upon receipt of that Order. On February 9, 2007, Plaintiff Salazar filed a (purportedly unopposed) Motion for Leave to File Supplemental Response to Defendant's Motion for Summary Judgment Nunc Pro Tunc. In that Motion, Plaintiff Salazar seeks leave to supplement his response to Defendants' Motion for Summary Judgment to introduce as evidence the Order of Non-Determination from the New Mexico Human Rights Division that he recently obtained. Defendants initially did not oppose the Motion, provided that they received a right to reply to Salazar's supplemental response. Defendants now object to Salazar's Motion, however, because Salazar failed to represent to the Court that Defendants' consent was conditioned on the right to reply. Defendants argue that as a sanction for his failure to disclose this condition, the Court should deny Salazar's Motion. Plaintiff Salazar's counsel maintains that the failure to disclose the condition was an oversight.

Although counsel certainly should be mindful of preparing motions and orders that accurately

24

reflect an opposing party's position, the Court declines to deny the Motion as a sanction because a sanction would penalize Plaintiff Salazar and not his counsel.  Rather, because Defendants did not initially oppose the Motion and because Defendants had an opportunity to respond to the Motion, the Court grants the Motion.  The Court notes that Defendants are not prejudiced by the Court's decision because they were on notice that Plaintiff Salazar intended to supplement his Response upon receipt of the Notice of Non-Determination and they already availed themselves of the opportunity to set forth their substantive arguments in opposition to Salazar's proposed Supplemental Response in their response to Plaintiff's Motion for Leave to File a Supplemental Response.  Because Plaintiff received an Order of Non-Determination from the Division, the Court denies Defendants' motion for summary judgment on the NMHRA claim based upon failure to receive the right to sue from the Division.

Defendants maintain that even if Plaintiff Salazar received a Right to Sue Letter from the EEOC and an Order of Non-Determination from the Division, Salazar nonetheless failed to exhaust his administrative remedies with respect to his Title VII and NMHRA claims to the extent they are based upon his termination and the loss of his supervisory authority.  Defendants concede that Plaintiff Salazar timely filed his Charge of Discrimination with the EEOC on June 9, 2003, identifying two discrete acts, *i.e.*, Salazar's January 2003 unsatisfactory evaluation and his alleged March 2003 demotion, as unlawful employment practices.[3]  Defendants maintain, however, and the Court agrees, that Plaintiff Salazar failed to identify his termination or the loss of his supervisory authority as alleged unlawful acts in his Charge.  The Court therefore grants Defendants' Motion for Summary

---

[3] Both of these acts occurred within 300 days of the date Plaintiff Salazar filed his Charge of Discrimination.

Judgment on the ground of failure to exhaust administrative remedies and dismisses Plaintiff Salazar's Title VII and NMHRA claims to the extent those claims are based upon any acts other than Salazar's January 2003 evaluation and his alleged March 2003 demotion.

The Court is not persuaded to hold otherwise by Plaintiff Salazar's argument that he exhausted his administrative remedies for his Title VII claims with respect to his termination and the loss of his supervisory authority by virtue of his January 13, 2004, letter to the EEOC. In that letter, Plaintiff Salazar references, among other things, (1) the permanent removal of his supervisory authority, (2) the termination and replacement of Salazar by a younger Caucasian employee, and (3) the allegedly hostile work environment created by Defendants McOlash and Griego.

Plaintiff Salazar's argument fails for two reasons. First, Salazar did not timely raise a claim for loss of his supervisory responsibility before the EEOC. The permanent removal of Plaintiff Salazar's supervisory authority occurred on July, 23, 2002. Plaintiff Salazar filed his letter allegedly supplementing his Charge of Discrimination on January 13, 2004, well over 300 days after the loss of his supervisory authority. Indeed, even if Plaintiff Salazar had raised the loss of his supervisory authority in his initial June 9, 2003, Charge, his claim nonetheless would fall outside of the 300-day time limit.[4]

Second, the case cited by Plaintiff Salazar for the proposition that he exhausted his administrative remedies with respect to his supervisory authority and his termination by virtue of his January 13, 2004, letter to the EEOC is not applicable here. In *Loe v. Heckler*, the District of Columbia Circuit held that when an employee supplements an EEOC charge with correspondence

_____

[4] In contrast, Plaintiff Salazar received the Notice of Contemplated Action on May 13, 2003; Salazar filed his Charge of Discrimination on June 9, 2003, and supplemented that Notice on January 13, 2004. Both of these dates fall within 300 days of his termination.

providing the agency with adequate notice of subsequent allegedly discriminatory acts, a court may construe the EEOC Charge of Discrimination to include those subsequent acts for purposes of determining exhaustion of administrative remedies.  768 F.2d 409, 419 (D.C. Cir. 1985).  The facts in *Loe* are distinguishable from the undisputed facts here.  In *Loe*, the acts raised in the supplementary correspondence occurred after the plaintiff filed her original EEOC charge.  *Id.*  Here, the matters raised in Plaintiff Salazar's January 13, 2004, letter occurred prior to Salazar's initial EEOC charge. Furthermore, in *Loe*, the District of Columbia Circuit explained that the EEOC had adequate notice and opportunity to address the matters raised in the plaintiff's supplemental correspondence because the plaintiff had raised those matters three months prior to the time the EEOC reached its determination.  Here, because the EEOC issued its Right to Sue letter on January 15, 2004, two days after Plaintiff Salazar drafted his January 13, 2004, letter, it is clear that the EEOC did not have adequate notice or an opportunity to address the matters raised in Salazar's letter.  This case is also distinguishable from *Loe* because Plaintiff Salazar's January 13, 2004, letter, was drafted eight days after the EEOC's January 5, 2004, deadline by which the parties were required to provide the EEOC with any additional information.  For these reasons, the Court concludes that the holding of *Loe* is inapplicable here.

II.   <u>Cross-Motions for Summary Judgment on Plaintiff Salazar's Procedural Due Process Claims</u>.

    A.   <u>Defendants' Motion</u>.

        1.   <u>Issue Preclusion</u>.

Defendants move for summary judgment on Plaintiff Salazar's 42 U.S.C. Section 1983 procedural due process claims on the ground that the findings of fact and conclusions of law of the SPB estop Salazar from bringing those claims.  The doctrine of issue preclusion requires a party

seeking to bar litigation of an issue to demonstrate the following:  "'(1) [that] the party to be estopped was a party or privy to the prior proceeding, (2) [that] the cause of action in the case presently before the court is different from the cause of action in the prior adjudication, (3) [that] the issue was actually litigated in the prior adjudication, and (4) [that] the issue was necessarily determined in the prior litigation.'"  *Rex, Inc. v. Manufactured Hous. Comm., Manufactured Hous. Div.*, 119 N.M. 500, 504, 892 P.2d 947, 951 (N.M. 1995) (quoting *Shovelin v. Central N.M. Elec. Coop., Inc.*, 115 N.M. 293, 297, 850 P.2d 996, 1000 (1993)).  If the moving party demonstrates each element of this test, the burden then shifts to the party opposing issue preclusion to show that he or she did not have a full and fair opportunity to litigate the issue in the prior litigation.  *Padilla v. Intel Corp.*, 125 N.M. 698, 701, 964 P.2d 862, 865 (N.M. Ct.  App. 1998); *Shovelin*, 115 N.M. at 297, 850 P.2d at 1000.

    With respect to the first requirement, Plaintiff Salazar was a party to the SPB proceeding.  With respect to the second requirement, the cause of action before this court is different from the cause of action before the SPB.  Here, Plaintiff Salazar seeks to obtain relief for alleged violations of his constitutional rights and his statutory rights under Title VII and the NMHRA.  In the SPB proceeding, Plaintiff Salazar sought to establish that Defendant NMDFA terminated him without just cause.  *Cf. Rex*, 119 N.M. at 510, 892 P.2d at 957 (disciplinary proceeding different from a private cause of action for damages). With respect to the third requirement, Plaintiff Salazar actually litigated the issues encompassed in the findings of fact and conclusions of law issued by Administrative Law Judge Padilla.  Plaintiff Salazar took the position that Defendant NMDFA did not have sufficient cause to terminate his employment.  Over the course of a three-day hearing, Plaintiff Salazar had the opportunity to examine and cross-examine witnesses, to submit documentary exhibits (including

deposition testimony of numerous witnesses who did not testify in person), and to make opening and closing statements. With respect to the fourth requirement, in concluding that Defendant NMDFA terminated Plaintiff Salazar for just cause, the findings and conclusions related to the just cause inquiry necessarily were determined by Administrative Law Judge Padilla.

This Court may give the findings and conclusions of a state administrative agency preclusive effect if (1) the state agency acted in a judicial capacity, (2) the state agency resolved disputed issues of fact properly before it, and (3) the parties had an adequate opportunity to litigate the issues. *Univ. of Tenn. v. Elliot*, 478 U.S. 788 (1986); *Salguero v. City of Clovis*, 366 F.3d 1168, 1173 (10th Cir. 2004). An administrative body acts in a judicial capacity when it is "required to investigate facts, or ascertain the existence of facts, hold hearings, and draw conclusions from them, as a basis for [its] official action." *Id.* (quoting *Zamora v. Village of Ruidoso Downs*, 120 N.M. 778, 781, 907 P.2d 182, 185 (N.M. 1995)).

Administrative Law Judge Padilla held a SPB hearing during which Judge Padilla made factual findings and conclusions of law in support of the determination that Defendant NMDFA terminated Plaintiff Salazar for just cause. The issue of whether Defendant NMDFA terminated Salazar for just cause properly was before the SPB. Specifically, Plaintiff Salazar filed a Notice of Appeal to the SPB contesting his dismissal and requesting a hearing before an administrative law judge designated by the SPB. The hearing was conducted by Administrative Law Judge Padilla pursuant to New Mexico Statutes Annotated Section 10-9-18 and the New Mexico Administrative Code § 1.7.12.8. The Court already has determined that Plaintiff Salazar and Defendant NMDFA had an adequate opportunity to litigate issues in the SPB proceeding. Based upon the foregoing, the Court concludes that the findings and conclusions of Administrative Law Judge Padilla may be given preclusive effect

by this Court.  *Cf.  Atiya v. Salt Lake County*, 988 F.2d 1013, 1019 (10th Cir. 1993) (plaintiff had adequate opportunity to litigate where she was represented by counsel who made opening and closing statements, called and cross-examined witnesses, and introduced exhibits at a hearing).

The Court next must determine whether in light of the SPB findings and conclusions Defendants are entitled to judgment as a matter of law on Plaintiff Salazar's 42 U.S.C. Section 1983 procedural due process claims.  The Fourteenth Amendment of the United States Constitution states in relevant part that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV.  The Supreme Court has held that "[a]n essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and an opportunity for hearing appropriate to the nature of the case.'"  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1984) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).  In the context of a public employee, this principle requires "some kind of a hearing" prior to the discharge of an employee who has a constitutionally protected property interest in his or her employment.  *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569-70 (1972).  In determining whether an individual has been deprived of a right to procedural due process, a court must determine (1) whether the individual possess a protected property interest such that due process protections were applicable, and if so, (2) whether the individual was afforded an appropriate level of process.  *Cleveland Bd. of Educ.*, 470 U.S. at 541; *Farthing v. City of Shawnee*, 39 F.3d 1131, 1135 (10th Cir. 1994).

The findings and conclusions of Judge Padilla that Defendants presented to this Court on summary judgment are not relevant to the two-part inquiry the Court must conduct.  The findings before this Court relate to Plaintiff Salazar's conduct as an employee of the NMDFA, including his

comments towards other employees, his attitude on the job, and his performance of his substantive duties. The findings also relate to the propriety of Defendant NMDFA's decision to discipline and ultimately terminate Plaintiff Salazar. Defendants have not demonstrated how these findings are relevant to the questions whether Plaintiff Salazar possessed a protected property interest or whether Defendant NMDFA afforded Plaintiff Salazar with an appropriate level of process prior to terminating him. Although Defendants set forth the conclusion of Judge Padilla that "Mr. Salazar was afforded due process," a state administrative law judge's conclusions are not necessarily determinative of the question whether there was a violation of the federal Constitution. *Cf. Martinez v. New Mexico State Engineer Office*, 129 N.M. 413, 420, 9 P.3d 657, 664 (N.M. 2000). Accordingly, Judge Padilla's conclusion of law is not binding upon this Court. Because Defendants have not demonstrated that the doctrine of issue preclusion bars Plaintiff Salazar from bringing his procedural due process claims, the Court denies Defendants' motion for summary judgment on this ground.

2.    <u>Existence of a Property or Liberty Interest</u>.

a.    <u>Property Interest</u>.

Defendants do not dispute that Plaintiff Salazar has a property interest in his continued income stream.[5] Defendants maintain, however, that Plaintiff Salazar cannot demonstrate that he was entitled to procedural due process protections for Defendants' decision to remove Salazar's supervisory authority or their decision to transfer Plaintiff Salazar to the position of Audit Coordinator.

---

[5] In the context of state employment, New Mexico law recognizes a property interest in the continuation of an income stream. *See, e.g.*, N.M. Admin. Code § 1.7.1.7.JJ (a "suspension" is "an involuntary leave of absence without pay for disciplinary reasons"); *Bd. of Educ. v. Harrell*, 118 N.M. 470, 477-78, 882 P.2d 511, 518-19 (N.M. 1994) (plaintiff entitled to the right to be fully compensated; plaintiff's claim of entitlement to employment satisfied so long as plaintiff continued to receive full compensation due under the contract); *Pitts v. Bd. of Educ*, 869 F.2d 555, 556 (10th Cir. 1989) (suspension with pay does not invade any recognized property interest).

31

Determining whether a property interest exists "depends not upon the Constitution but on 'independent sources such as state law,'" *Cleveland Bd. of Educ.*, 470 U.S. at 542 (quoting *Roth*, 408 U.S. at 577), including state statutes, local ordinances, established rules, or mutually explicit understandings. *Farthing*, 39 F.3d at 1135.  A public employee such as Plaintiff Salazar must have a "legitimate claim of entitlement" to continued public employment for a property interest to arise; a "unilateral expectation" of continued public employment is not sufficient to create a property interest. *Roth*, 408 U.S. at 577.

Plaintiff Salazar maintains that Defendants' decision to remove his supervisory authority, terminate his position as General Manager, and appoint him Audit Coordinator constitutes a "demotion" under New Mexico law based upon the New Mexico Administrative Code's definition of "demotion."  Section 1.7.1.7(L) of the Administrative Code defines "demotion" as "*an involuntary downward change* for disciplinary reasons with a reduction in pay within an employee's Pay Band or Pay Opportunity or from a classified position in one Pay Band or Pay Opportunity to a classified position in a lower Pay Band or Pay Opportunity with a reduction in pay or *from a Manager Category to a Technical Occupation Group* and/or removal of supervisory responsibilities and pay for disciplinary reasons."   N.M. Admin. Code § 1.7.1.7(L) (emphasis added).  Plaintiff Salazar maintains that because Defendant NMDFA involuntarily transferred him from a manager category to a technical occupation group for disciplinary reasons when it decided to terminate his position as Acting Director of ASD and appoint him as Audit Coordinator in July 2002, he was demoted within the meaning of the Code.

The Court disagrees.  Although Defendants asked Plaintiff Salazar to assume the functions of Audit Coordinator in July 2002, they did not officially reclassify Salazar's job title from General

Manager to a technical job classification until March 28, 2003, when Salazar signed the Voluntary Reduction Without Loss in Salary Agreement.  Moreover, Defendants did not reduce Plaintiff Salazar's salary in July of 2002 when Salazar assumed the functions of Audit Coordinator, and Defendants did not place Salazar in a lower pay band.  The Code defines a demotion as "an involuntary downward change . . . from a Manager Category to a Technical Occupation Group."  *Id.*  The Code also defines a "demotion" as "an involuntary downward change . . .  for disciplinary reasons with a reduction in pay within an employee's Pay Band or Pay Opportunity" or as the "removal of supervisory responsibilities and pay for disciplinary reasons."  *Id.*  Because in July 2002 Defendants did not officially transfer Plaintiff Salazar from a General Manager category to a technical category, and because Defendants did not remove or reduce Salazar's pay, he was not "demoted" within the meaning of the Code.

Although Defendants did place Plaintiff Salazar in a lower pay band as of March 28, 2003, this change in Salazar's position did not amount to a demotion because that change was voluntary. It is undisputed that Plaintiff Salazar signed a Voluntary Reduction Without Loss in Salary Agreement.  Plaintiff Salazar took it home, read it, and returned it signed and without protest. Although Plaintiff Salazar noted in handwriting at the bottom of his copy of the Agreement that "[t]he implication if I did not sign this document at this time that there would be reprisal taken against me," Salazar concedes that he did not give this version to anyone at the NMDFA until after he filed his SPB action.  Although Salazar argues that he was not given any other option besides the voluntary reclassification and that he felt he had to sign the reclassification if he wanted to retain his job at the NMDFA, Salazar presents no legal argument or authority in support of an argument that these facts render his signature "involuntary" or "coerced."  Because Plaintiff Salazar's change in position from

33

General Manager to Financial Coordinator A was not involuntary, Salazar was not "demoted" within the meaning of the Code.

Moreover, the Code alone does not answer the question whether New Mexico law grants an employee like Salazar a property right in a particular job classification absent a reduction in pay.[6] Indeed, courts routinely have rejected the notion that property rights exist in the mere rights and duties related to a position of employment absent a reduction in pay. *Bd. of Educ. v. Harrell*, 118 N.M. 470, 477-78, 882 P.2d 511, 518-19 (N.M. 1994); *see also Pitts v. Bd. of Educ*, 869 F.2d 555, 556 (10th Cir. 1989) (suspension with pay does not invade any recognized property interest).[7] Indeed, the New Mexico Supreme Court held in *Board of Education v. Harrell* that an employee did not have a Fourteenth Amendment property right to occupy a particular office. *Harrell*, 118 N.M. at 477-78, 882 P.2d at 518-19. The *Harrell* court explained that a plaintiff's sole property right in his or her employment is limited to the right to receive full compensation due under his or her

---

[6] A "demotion" within the meaning of 1.7.1.7(L) invokes the procedural protections of New Mexico Administrative Code Section 1.7.11.13 (Notice of Contemplated Action).

[7] *See also Jett v. Dallas Indep. School Dist.*, 798 F.2d 748, 754 (5th Cir. 1986), *modified on other grounds*, 491 U.S. 701 (1989); *Schneeweis v. Jacobs*, 771 F. Supp. 733, 737 (E.D. Va.1991) (high school teacher's property interest in supplemental coaching position was extinguished by the school board's payment to her of the full stipend due for the coaching season), *aff'd*, 966 F.2d 1444 (4th Cir. 1992); *Kinsey v. Salado Indep. Sch. Dist.*, 950 F.2d 988, 997 (5th Cir. 1992) (public school superintendent relieved of his duties under an employment contract, but with full compensation, did not have constitutionally protected property interest in the noneconomic benefit of serving in the position of superintendent, and there was no deprivation of his property interest in the economic component of his employment, because he received full compensation); *Edwards v. California Univ. of Pa.*, 156 F.3d 488, 492 (3d Cir. 1998) (neither suspension with pay nor resultant stigma to reputation unconstitutionally deprived plaintiff of property interest); *Fields v. Durham*, 909 F.2d 94, 98 (4th Cir. 1990) ("the constitutionally protected interest in employment does not extend to the right to possess and retain a particular job or to perform particular services"); *Royster v. Bd. of Trustees of Anderson County Sch. Dist. No. 5*, 774 F.2d 618, 621 (4th Cir. 1985) (public employee's property interest does not extend to "the right to actively engage in and execute the duties of [an] office").

34

employment contract. *Id.* Because courts have rejected the notion that an employee has a property right in his or her job duties or responsibilities absent a reduction in pay, the Court concludes on the record before it that Plaintiff Salazar did not have a property right in his duties or responsibilities as a General Manager or in his supervisory authority. The Court further concludes that even if state law provided Plaintiff Salazar with a property interest in something other than the continuation of an income stream, Defendant Varela (the sole remaining individual defendant to this claim) in his individual capacity nonetheless would be entitled to summary judgment in his favor on the ground of qualified immunity because any such property interest was not clearly established.

The Court is not persuaded otherwise by Plaintiff Salazar's remaining arguments. Plaintiff Salazar argues, for example, that he had a property right in his supervisory authority because that authority placed him in a higher pay band with higher potential for annual income. New Mexico Administrate Code Section 1.7.4.11(F)(1) provides for a pay increase of up to 20 percent of an employee's base rate for an employee in a technical occupation group who accepts and consistently performs duties that are characteristic of a supervisor. Without supervisory authority, Plaintiff Salazar was not eligible for this pay increase. Plaintiff Salazar, however, has cited no authority for the proposition that an employee has a property right in the opportunity to receive a discretionary bonus from his or her employer. Moreover, New Mexico case law indicates that an employee's property right is limited to the right to receive the full compensation "due," and not potential compensation from a bonus. *Id.* at 477-78, 882 P.2d at 518-19.

Plaintiff Salazar also argues that as a result of not having supervisory authority he no longer qualified for Deputy Division Director or Division Director and that the loss of future advancement opportunities or opportunities that have an indirect effect on future income can inflict an actionable

deprivation of property.  The Court already has rejected the notion that an employee has a property right in the mere possibility of receiving a discretionary bonus.  The Court likewise rejects the notion that an employee has a property right in a particular office because that position opens the door to (wholly speculative) future employment opportunities.

Plaintiff Salazar's citation to *Head v. Chicago School Reform Board of Trustees*, 225 F.3d 794 (7th Cir. 2000), is likewise unavailing.  In *Head*, the plaintiff had a right to the particular position from which he was removed by virtue of a four-year written employment contract and the Illinois School Code, which provided that the plaintiff could only be discharged during the term of his contract for cause following extensive notice and hearing procedures.  *Id.* at 798-99.  Although the plaintiff maintained he had a property interest in occupying a specific office, the plaintiff had a written contract with his employer that identified the specific position he was to occupy.  *Id.* at 803.  The Seventh Circuit noted that the plaintiff " might" have had a property interest in completing his contract according to its terms, including the term designating the plaintiff's job position, but the court declined to so determine.  *Id.* at 802.  Instead, the Court held that even if such a property right existed, the plaintiff received all of the process he was due.  *Id.* at 804-05.

The facts of *Head* are distinguishable.  In *Head*, the plaintiff argued he was entitled to his own position by virtue of his contract.  Here, Plaintiff Salazar argues that he was entitled to his position of General Manager because that position opened up future employment opportunities.  Moreover, unlike the plaintiff in *Head*, Plaintiff Salazar had no employment contract with Defendant NMDFA designating a specific position that Salazar was to occupy.  Because the facts of *Head* are distinguishable from the facts here, the Court declines to find that Salazar had a property right in his position as General Manager because that position opened up future (speculative) employment

36

opportunities for Salazar.

Having determined that New Mexico does not recognize a property interest in the right to hold a particular office and having rejected Plaintiff Salazar's arguments to the contrary, the Court concludes that Defendants' are entitled to summary judgment in their favor, on Salazar's procedural due process claims to the extent they are based upon his deprivation of an alleged property right in his supervisory authority or position.[8]

> b. <u>Liberty Interest</u>.

Defendants maintain that they are entitled to judgment as a matter of law in their favor on Plaintiff Salazar's claims that he possessed a liberty interest in his good name and reputation subject to due process protections.  To establish a claim for deprivation of a liberty interest in one's good name and reputation, a plaintiff must meeting a four-part test:  (1) the statements must impugn the good name, reputation, honor, or integrity of the employee, (2) the statement must be false, (3) the plaintiff must be terminated incident to the alleged defamation, and (4) the statements must be published.  *Sigham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1153-54 (10th Cir. 2001) (citation omitted).  Defendants argue that Plaintiff Salazar has presented insufficient evidence to indicate that the statements were false.  Having pointed out that there is insufficient evidence to support Plaintiff Salazar's claim, Salazar was required to fulfill his summary judgment burden of

---

[8] Because the Court already has held that Plaintiff Salazar does not have a property right in his supervisory authority or in his job title absent a reduction in pay, the Court need not reach the second part of the procedural due process analysis and determine whether Salazar received adequate process when Defendants reprimanded him and removed his supervisory authority.  The Court nonetheless notes, however, that Defendants gave Plaintiff Salazar notice of the charges against him and an opportunity to be heard during the June 24, 2002, meeting he had with Defendant Cabinet Secretary Fields.  This meeting occurred before Defendants permanently removed his supervisory authority and before they transferred him to the position of Audit Coordinator.

coming forward with specific facts indicating that the statements were false.  In his response to Defendants' motion, however, Salazar failed to identify any specific facts, or, indeed, to present any argument at all on the question of the existence of a liberty interest.  The Court therefore concludes that Defendants' are entitled to summary judgment in their favor, and the Court dismisses Plaintiff Salazar's procedural due process claims to the extent they are based upon deprivation of a liberty interest in Salazar's good name and reputation.

3.    Appropriate Level of Process.

Although Defendants do not dispute that Plaintiff Salazar had a property interest in his continued employment at the NMDFA (*i.e.*, his right to the continuation of his income stream), Defendants argue that they nonetheless are entitled to summary judgment in their favor because even if Salazar had a property interest in his continued public employment, Defendants gave Plaintiff Salazar all of the process he was due when they terminated his employment.  *Cf. Cleveland Bd. of Educ.*, 470 U.S. at 541.  The fact that a public employee has a property interest in his or her continued employment does not grant that employee the right to a full evidentiary hearing prior to his or her termination. *Id.* at 542.  Rather, a "tenured public employee is entitled to oral or written notice of the charges against him [or her], an explanation of the employer's evidence, and an opportunity to present his [or her] side of the story.  *Id.* at 546 (citation omitted).

The uncontested facts demonstrate that Plaintiff Salazar received a Notice of Contemplated Action on May 14, 2003.  The Notice sets forth nine paragraphs asserting the reasons for the contemplated dismissal followed by this statement:  "You have seven calendar days from service of this notice to respond in writing to the notice or to request an opportunity for an oral response." Plaintiff Salazar admits that he did not respond to the Notice, and alleges that the vagueness of the

Notice prevented him from doing so.  The Court already has concluded that a review of the Notice indicates that it is sufficiently concrete such that Plaintiff Salazar could have framed a response.  The Court explained that the Notice lists the following factors in support of the contemplated termination: (1) Salazar's making of offensive remarks for which Salazar was reprimanded, (2) Salazar's unsatisfactory work appraisals, (3) Salazar's blaming of others for his own failures, (4) Salazar's hostile attitude towards others, (5) Salazar's questioning of authority, and (6) Salazar's filing of a dubious worker's compensation claim.  The Court further noted that Salazar neither responded to the Notice nor requested additional time to do so.  The Court concluded that "[h]aving failed to avail himself of the process offered to him, Salazar may not now be heard to complain that he was deprived of pre-termination due process."  Mem. Op. & Order, dated Feb. 14, 2006, at 9  [Doc. No. 94].  The undisputed facts also demonstrate that Plaintiff Salazar admitted in his deposition that he requested and received an opportunity to make an oral response to Defendant Secretary Jimenez and that that meeting took place after Plaintiff Salazar received the Notice of Contemplated Action and before he received the Notice of Final Action.  Based upon the foregoing, the Court concludes that Plaintiff Salazar received adequate pre-termination process.[9]

The Court also concludes that Plaintiff Salazar received appropriate post-termination process. The undisputed facts demonstrate that Plaintiff Salazar received a full-blown, three-day, adversarial, post-termination hearing in which he was represented by counsel and in which he had the right to serve interrogatories and requests for documents, call and cross-examine witnesses, and submit

---

[9] The fact that Defendants failed to provide Plaintiff Salazar with the documents he requested in his May 21, 2003, memorandum does not persuade the Court otherwise.  The Due Process Clause only requires oral or written notice of the charges against an employee, an explanation of the employer's evidence, and an opportunity to present the employee's side of the story, and Plaintiff Salazar conceded in his deposition that he received this pre-termination process he was due.

documentary exhibits.  The Court therefore grants Defendants' motion for summary judgment and dismisses Plaintiff Salazar's procedural due process claims.

        B.     <u>Plaintiff's Motion</u>.

        To the extent Plaintiff Salazar moves for summary judgment on his 42 U.S.C. Section 1983 procedural due process claims based upon deprivation of his property rights without due process of law, the Court denies that motion.  The Court already has held that Plaintiff Salazar does not have a property interest in a particular office or his supervisory authority, and that Salazar received all of the process he was due with respect to his termination.

        Plaintiff Salazar, however, also moves for summary judgment on his procedural due process claims based upon his alleged liberty interest in his First Amendment right to seek redress of his grievances.  Specifically, Salazar maintains that he had a liberty interest in his right to appeal his February 23, 2003, formal grievance and that he had a liberty interest in his right to seek redress for his 2002 complaint against Defendants Hassall and Spencer.  Plaintiff cites no authority, and this Court can find no authority, establishing a liberty interest in a First Amendment right to seek redress.

        The Court, however, declines to address Plaintiff Salazar's liberty interest claim based upon an alleged First Amendment right to redress because Salazar failed to allege this claim in his First Amended Complaint.[10]  Plaintiff Salazar also failed to identify the claim in the "Contentions" section of the Initial Pre-Trial Report.  Because the claim has not been properly pled, Plaintiff Salazar cannot raise the claim on summary judgment.  Allowing Plaintiff to do so would severely prejudice Defendants.  The Court therefore denies Plaintiff Salazar's motion for summary judgment on his

---

      [10] Plaintiff Salazar only alleges that he has a "liberty and a property interest in continued employment, income, professional opportunities, and retirement opportunities," and that he has a "liberty interest in pursuing his occupation and avocation."

alleged procedural due process claim based upon a First Amendment liberty interest.

The Court further notes that any amendment of Plaintiff Salazar's Complaint to add a liberty interest claim based upon Salazar's alleged right to appeal his February 23, 2003, formal grievance and his right to seek redress for his 2002 complaint would be futile.  The Court already has noted that Plaintiff Salazar cites no authority, and that the Court can find no authority, that establishes a liberty interest in a First Amendment right to seek redress. Moreover, courts uniformly have held that state procedural requirements, such as a grievance procedure, do not alone give rise to a substantive liberty interest.  *See, e.g.*, *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1995) ("any right to a grievance procedure is a procedural right, not a substantive one" and therefore "a state's inmate grievance procedures do not give rise to a liberty interest protected by the Due Process Clause") (citations omitted); *Shango v. Jurich*, 681 F.2d 1091("[e]ven if Illinois regulations provide a right to a hearing prior to interprison transfers, that procedural right is not accorded federal due process protection"; "a state created procedural right is not itself a liberty interest within the meaning of the Fourteenth Amendment").[11]  Courts also have rejected such claims on the ground that the fact that

---

[11] *See also Gilbreath v. Clark*, 2006 U.S. App. LEXIS 18351 (10th Cir. July 18, 2006 ("prison grievance procedures do not 'give rise to a protected liberty interest requiring the procedural protections envisioned by the fourteenth amendment'") (citation omitted)); *Doyle v. Pasquino*, No. 05-251-MJR, 2006 U.S. Dist. LEXIS 9718 (S.D. Ill. Feb. 15, 2006) (state inmate who filed grievances that were allegedly "lost" by a prison did not state a valid liberty interest because such "grievance procedures do not give rise to a liberty interest protected by the due process clause"; "[t]he Constitution requires no procedure at all, and the failure of state prison officials to follow their own procedures does not, of itself, violate the Constitution"); *Azeez v. DeRobertis*, 568 F. Supp. 8, 10 (E.D. Ill. 1982) (although state created statutory procedural protections creating a grievance procedure "may be evidence of a parent substantive right, they do not in themselves trigger a protected liberty interest"; "[h]ence, [a grievance procedure] does not give rise to a protected liberty interest requiring the procedural protections envisioned by the fourteenth amendment"); *Graham v. Coughlin*, 99 Civ. 3371 (DAB), 2000 U.S. Dist. LEXIS 1439 ("The federal regulations providing for an administrative remedy procedure do not in and of themselves create a liberty interest in access to that procedure.  When the claim underlying the administrative grievance involves a constitutional

the plaintiffs were pursuing litigation proved that they were receiving redress. *See Antonelli*, 81 F.3d at 1430-31 ("Moreover, plaintiff's invocation of the judicial process indicates that the prison has not infringed his First Amendment right to petition the government for a redress of grievances.") (citing cases).

III.   Cross-Motions for Summary Judgment on Plaintiff's Section 1983 Substantive Due Process Claims.

    A.   Defendants' Motion.

        1.   Issue Preclusion.

Defendants maintain that they are entitled to summary judgment in their favor on Plaintiff Salazar's substantive due process claims on the ground that the doctrine of issue preclusion bars Plaintiff Salazar from arguing that Defendants' actions of withdrawing his supervisory authority, appraising his job performance as unsatisfactory, and terminating him were arbitrary and capricious. The due process clause of the Fourteenth Amendment provides that a state may not "deprive any person of life, liberty or property without due process of law." U.S. Const. Amend. XIV. "Although the phrase 'due process' connotes a right to a fair hearing, the Supreme Court has recognized that the clause contains a substantive component as well." *Archuleta v. Colorado Dep't of Institutions*, 936 F.2d 483, 489 (10th Cir. 1991). "The substantive component of the Due Process Clause protects those rights that are fundamental, that is, rights that are implicit in the concept of ordered liberty."

---

right, the prisoner's right to petition the government for redress is the right of access to the courts, which is not compromised by the prison's refusal to entertain his grievance."); *compare Jennings v. City of Stillwater*, 383 F.3d 1199, 1206 (10th Cir. 2004) ("a detailed procedural structure does not give rise to a protected liberty interest" absent a "substantive legal obligation underlying the procedures"; "process is not an end in itself [but rather] [i]ts constitutional purpose is to protect a substantive interest to which the individual has a claim of entitlement").

*McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (en banc) (quotations omitted). As observed by the Tenth Circuit, "It is not clear what interest is required to trigger substantive due process guarantees." *Archuleta*, 936 F.2d at 489 n.6. The Supreme Court has held that most of the rights enumerated in the Bill of Rights are fundamental. Certain unenumerated rights, such as the right to privacy, also implicate substantive due process protection. *Planned Parenthood v. Casey*, 510 U.S. 1309 (1992). "A finding that a right merits substantive due process protection means that the right is protected against certain government actions regardless of the fairness of the procedures used to implement them." *McKinney*, 20 F.3d at 1556.

Defendants maintain that even if a protected property interest in continued employment exists, Plaintiff Salazar cannot establish a substantive due process violation as a matter of law based upon Defendants' actions of withdrawing his supervisory authority, appraising his job performance as unsatisfactory, and terminating his employment because the findings of Administrative Law Judge Padilla preclude Plaintiff Salazar from establishing that Defendants acted in an arbitrary or capricious manner in making these decisions. "Substantive due process requires only that termination of that interest not be arbitrary, capricious, or without a rational basis." *Curtis v. Okla. City Pub. Schs. Bd. of Educ.*, 147 F.3d 1200, 1215 (10th Cir. 1998) (internal quotation and citation omitted). This threshold is not high. "'The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.'" *Id.* (quoting *Bishop v. Wood*, 426 U.S. 341, 350 (1976)).

The Court already has determined that the findings of Administrative Law Judge Padilla are binding on Plaintiff Salazar here. Judge Padilla found, among other things, that Plaintiff Salazar made inappropriate remarks to female employees under his supervision; that Plaintiff Salazar exhibited a

hostile and/or uncooperative work attitude toward Defendant McOlash, Defendant Hassall, other management personnel, and other employees; that Plaintiff Salazar failed to perform his job duties as audit coordinator satisfactorily; and that Plaintiff Salazar failed to complete his job assignments, failed to reconcile accounts properly, and failed to do his work correctly.  These factual findings demonstrate as a matter of law that Defendants' decisions to withdraw his supervisory authority, appraise his job performance as unsatisfactory, and/or terminate him were not arbitrary, capricious, or without a rational basis.  Although Plaintiff Salazar argues that Defendants acted arbitrarily in (1) deciding to discipline him for the women's complaints instead of mediating the complaints, (2) deciding that Salazar's June 25, 2002, letter was not a grievance, (3) deciding to remove Salazar's supervisory authority when there were no additional similar complaints against Salazar, (4) refusing to assist Salazar to compel audit team members to produce information, (5) appraising Salazar's performance as unsatisfactory in January 2003, (6) determining that Salazar's April 17, 2003, letter to Jimenez was not an appeal, (7) deciding that Salazar's May 21, 2003, request for documents was not related to the Notice of Contemplated Action, and (8) allowing Spencer to provide legal advice despite being named by Salazar as a respondent to his complaint, the findings of the SPB and Judge Padilla are sufficient to establish as a matter of law that Defendants had rational reasons for each of these decisions.  The Court therefore grants Defendants' motion for summary judgment and dismisses Plaintiff Salazar's substantive due process claims on this ground.[12]

---

[12] Even if issue preclusion did not bar Plaintiff Salazar's claims, the Court nonetheless would conclude, based upon the undisputed facts (or, where disputed, the facts construed in Plaintiff Salazar's favor), that Salazar cannot establish as a matter of law that Defendants acted in an arbitrary and capricious manner.  Accordingly, Defendants are entitled to summary judgment in their favor on this independent ground as well.

2.      Substantive Due Process Right in Employment.

Defendants also argue, and the Court agrees, that they are entitled to summary judgment in their favor on the independent ground that there is no substantive due process protection for a public employee's interest in his or her employment.  "The substantive component of the Due Process Clause protects those rights that are fundamental, that is, rights that are implicit in the concept of ordered liberty. . . .  A finding that a right merits substantive due process protection means that the right is protected against certain government actions regardless of the fairness of the procedures used to implement them." *McKinney*, 20 F.3d at 1556 (quotations omitted), *cited in Roe v. Antle*, 964 F. Supp. 1522 (D.N.M. 1997).  Neither the Supreme Court nor the Tenth Circuit has decided whether substantive due process protects a public employee's property interest in his employment.  *Herrera v. City of Albuquerque*, No. 98-2243, 1999 U.S. App. LEXIS 25562, at *6-7 (10th Cir. Oct. 13 1999) (unpublished opinion) ("[a]t present, the question of whether a tenured employee's property interest in continued employment is subject to substantive due process protections is unsettled"); *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1257 (10th Cir. 1998 ) ("Our circuit precedent does not clearly delineate what specific property interests in employment are fundamental, and thus protected by the doctrine of substantive due process."); *Archuleta*, 936 F.2d at 489 n.6 ("For purposes of this opinion, we assume, without holding, that the plaintiffs property interest [in her employment] is entitled to the protection of substantive due process. . . .  It is not clear what interest is required to trigger substantive due process guarantees. . . .  The Supreme Court has not expressly determined whether all property is entitled to such protection.").

Several other Circuits, however, have considered this issue, with the Fourth, Sixth, Seventh, Eighth, and Eleventh Circuits concluding that there is no substantive due process right to

employment, and the First, Second, and Fifth Circuits holding that such a right does exist. *Compare McKinney*, 20 F.3d at 1556-60 (substantive due process does not protect an individual's property interest in public employment); *Huang v. Bd. of Governors of Univ. of N.C.*, 902 F.2d 1134, 1142 n.10 (4th Cir. 1990) (state-created employment does not enjoy substantive due process protection); *Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1350-51 (6th Cir. 1992) (same);*Brown v. Brienen*, 722 F.2d 360, 366-67 (7th Cir. 1983) (substantive due process does not protect a public employee's contract right to overtime compensation); *Singleton v. Cecil*, 176 F.3d 419, 428 (8th Cir. 1999) (same); *with Harrington v. Harris*, 108 F.3d 598 (5th Cir. 1997) (substantive due process does protect an individual's property interest in public employment);*Newman v. Massachusetts*, 884 F.2d 19, 25 (1st Cir. 1989) (same); *Gargiul v. Tompkins*, 704 F.2d 661, 668 (2d Cir. 1983) (same), *vacated on other grounds*, 465 U.S. 1016 (1984); *cf. Lum v. Jensen*, 876 F.2d 1385, 1389 (9th Cir. 1989) (in 1984 there was "no clearly established constitutional right to substantive due process protection of continued employment").

The Court finds the reasoning of the Fourth, Sixth, Seventh, Eighth, and Eleventh Circuits persuasive. The Supreme Court has been reluctant to extend substantive due process protection beyond fundamental constitutional rights. *Collins v. City of Hanker Heights*, 503 U.S. 115, 125 (1992). The Supreme Court has explained that because substantive due process rights are "created only by the Constitution," areas in which substantive rights are created by virtue of state law (such as tort law) remain largely outside the scope of the substantive due process doctrine. *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 229 (1985) (Powell, J., concurring). The Tenth Circuit has likewise held that "[r]ights of substantive due process are founded not upon state provisions but upon deeply rooted notions of fundamental personal interests derived from the Constitution." *Mangels*

*v. Pena*, 789 F.2d 836, 839 (10th Cir. 1986).   The Court therefore concludes that Plaintiff Salazar does not have an interest in his continued employment protected by the substantive due process doctrine.   Accordingly, Defendants are entitled to summary judgment on Plaintiff Salazar's substantive due process claims on this ground as well.

Defendants also argue that even if a substantive due process right in continued public employment exists, the individual Defendants are entitled to qualified immunity on Plaintiff Salazar's substantive due process claims because the law setting forth this right was not clearly established. The Court agrees.  Neither the Supreme Court nor the Tenth Circuit has recognized such a right and the clear weight of authority from the other circuits does not recognize such a right.  The Court therefore concludes that the individual Defendants are protected by the doctrine of qualified immunity and dismisses Plaintiff's substantive due process claims against the individual Defendants in their individual capacities on this ground as well.

      B.    <u>Plaintiff's Motion</u>.

Plaintiff Salazar moves for summary judgment on his 42 U.S.C. Section 1983 substantive due process claims.  Because the Court already has held that Plaintiff Salazar's claim must fail because it is barred by collateral estoppel and because Salazar does not have a substantive due process right in his employment, the Court denies Salazar's motion for summary judgment on his substantive due process claims.

III.   Cross-Motions for Summary Judgment on Plaintiff Salazar's Section 1983 Equal Protection Clause Claims.

A.   Defendants' Motion.

1.   Issue Preclusion:  Class-of-One Claim.

Defendants maintain that Plaintiff Salazar's equal protection claims must fail because the SPB findings preclude Plaintiff Salazar from demonstrating that Defendants' actions of withdrawing his supervisory authority, appraising his job performance as unsatisfactory, and terminating him were arbitrary or capricious.  The law recognizes three species of equal protection claims:  (1) charges that the government singled out members of a protected group for unequal treatment; (2) challenges to laws and policies alleged to make irrational distinctions; and (3) claims that the government acted against a blameless individual because a powerful state official harbored a malignant animosity towards that individual.  *Cf. Garcia v. State of N.M. Office of the Treasurer*, 959 F. Supp. 1426 (D.N.M. 1997); *see also Esmail v. Macrane*, 53 F.3d 176, 178 (7th Cir. 1995) (citations omitted). The third type of equal protection claim implicates the arbitrary and capricious standard raised by Defendants.

To sustain this third type of equal protection claim, Plaintiff Salazar must demonstrate that he was "singled out for persecution due to some animosity" on the part of Defendants, *Bartell v. Aurora Pub. Schs.*, 263 F.3d 1143, 1149 (10th Cir. 2001), and that Defendants acted out of a spiteful attempt to "get" Salazar for reasons wholly unrelated to any legitimate state objective, *id.*  The Tenth Circuit has recognized that these class-of-one claims must be "carefully circumscribed" to avoid providing a federal cause of action for review of almost every decision made by state actors. *Stillwater*, 383 F.3d at 1210-11.  Only the most clear acts of arbitrary persecution will satisfy this

standard. *Id.*

As this Court already has held that Judge Padilla's findings and conclusions preclude Plaintiff Salazar from arguing that Defendants acted in an arbitrary or capricious manner when they withdrew Salazar's supervisory authority, gave Salazar an unsatisfactory performance evaluation, and terminated Salazar's employment. Accordingly, the Court concludes that Judge Padilla's findings prevent Plaintiff Salazar from demonstrating that Defendants engaged in arbitrary persecution of Salazar in violation of the Equal Protection Clause. The Court therefore grants Defendants' motion for summary judgment seeking dismissal of Plaintiff Salazar's equal protection claims to the extent those claims are based upon a class-of-one theory.

2.    Differential Treatment Based Upon Membership in a Protected Class.

To the extent Plaintiff Salazar also alleges an equal protection claim based upon his status as a member of a protected class, both that claim, as well as Salazar's class-of-one claim, are subject to dismissal on the ground that Plaintiff Salazar has not set forth any evidence that he has been treated differently from other employees who are similarly situated. Plaintiff Salazar presents evidence that a female employee at the NMDFA complained that Chris Hoffman, a White employee, held her by the shoulders and shook her in an angry manner," and that Hoffman was not disciplined. Plaintiff Salazar also maintains that Defendant Spencer advised former ASD Director Ortiz not to follow through with the written reprimands against Defendant Hassall but advised Defendant Cabinet Secretary Fields to write and place a letter of reprimand in Salazar's personnel file. Plaintiff Salazar further presented evidence that he received an unsatisfactory appraisal after successfully completing the Fiscal Year 2002 audit on time and with an unqualified opinion, when Defendant McOlash did not receive an unsatisfactory evaluation after completion of that audit and when the newly-hired Chief

49

Financial Officer did not receive an unsatisfactory evaluation after completing subsequent audits in an untimely fashion and with twice as many audit findings as the 2002 audit.

Although Plaintiff Salazar may have shown isolated instances of differential treatment of employees engaging in wrongful conduct, Salazar has not presented evidence indicating that these employees were similarly situated.  For example, although Defendant Hassall and Mr. Hoffman may not have been disciplined for their conduct, Plaintiff Salazar has not demonstrated that Hassall and Hoffman had similar disciplinary histories (*e.g.*, previous instances of discipline for the very same conduct).  Moreover, Plaintiff Salazar has not demonstrated that Hassall, Hoffman, and the newly-hired Chief Financial Officer had any job performance problems that Salazar had or that they received the two consecutive negative job evaluations that Salazar received.  Because Plaintiff Salazar has not satisfied his summary judgment burden of pointing to specific facts indicating that Defendants treated similarly-situated employees differently, the Court grants Defendants' Motion for Summary Judgment on Salazar's equal protection claims.

B.    Plaintiff's Motion.

Plaintiff Salazar moves for summary judgment on his 42 U.S.C. Section 1983 equal protection claims.  Because the Court already has held that Plaintiff Salazar's claims must fail because they are barred by collateral estoppel and because Salazar cannot demonstrate that he was treated differently from similarly-situated employees, the Court denies Salazar's motion for summary judgment on his equal protection claims.

V.   Cross-Motions for Summary Judgment on Plaintiff Salazar's Section 1985 Claims.

    A.   Defendant's Motion.

        1.   Issue Preclusion.

Defendants maintain that the findings of fact and conclusions of law of Administrative Law Judge Padilla preclude Plaintiff Salazar from bringing his conspiracy claims under 42 U.S.C. Section 1985(3). The essential elements of a conspiracy claim are as follows: (1) a conspiracy, motivated by racially discriminatory animus; (2) to deprive a plaintiff of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting from the conspiracy. *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993) (setting forth elements of Section 1985(3) claim); *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971) (conspiracy must be motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus").

The findings and conclusions of Judge Padilla relate to Plaintiff Salazar's conduct as an employee of the NMDFA, including his comments towards other employees, his attitude on the job, and his performance of his substantive duties, as well as the propriety of Defendant NMDFA's decision to discipline and ultimately terminate Plaintiff Salazar. Defendants have presented no argument indicating how these findings and conclusions are relevant to the question whether Defendants engaged in a racially motivated conspiracy to deprive Plaintiff Salazar of equal protection or privileges and immunities, whether Defendants took any acts in furtherance of that conspiracy, and whether an injury or deprivation resulted from the conspiracy. Accordingly, even if the Court gives Judge Padilla's findings and conclusions preclusive effect, Defendants have not demonstrated that these findings and conclusions bar Plaintiff Salazar from bringing his Section 1985(3) conspiracy claims as a matter of law. The Court therefore denies Defendants' motion seeking summary judgment

on this ground.

2.      Racial Discriminatory Animus.

Defendants, however, also maintain, and the Court agrees, that they are entitled to summary judgment in their favor on Plaintiff Salazar's Section 1985 claims because Salazar has not set forth facts sufficient to demonstrate that the alleged conspiracy was brought as a result of Salazar's membership in a particular class and that the criteria for defining this class were invidious.  *Cf. Trujillo v. City of Albuquerque,* No. 05-2314, 2006 U.S. App. LEXIS 28221 (10th Cir. Nov. 13, 2006) (plaintiff must show a conspiracy against him because of his membership in a class, and that the criteria defining the class were invidious).  A Section 1985(3) conspiracy must be motivated by some racial or class-based "invidiously discriminatory animus."  *Cf. Griffin*, 403 U.S. at 102. Because Defendants satisfied their initial summary judgment burden of pointing out that there is an absence of evidence of racially discriminatory animus, Plaintiff Salazar was required to come forward with specific evidence of racial animus.  Salazar has not satisfied this burden.

Salazar asserts that he is of Hispanic ancestry, and that Defendants Spencer and Hassall had "a tacit agreement to work together to have Plaintiff, of Hispanic descent, disciplined and demoted without Due Process of law."  General references to race, and not to racial animus, are insufficient as a matter of law to demonstrate discriminatory racial animus.  Plaintiff Salazar also presents evidence that Defendants treated other employees differently, that Defendants failed to grant Salazar an opportunity to resolve the women's complaints against him informally before disciplining him,[13]

---

[13] Although Plaintiff Salazar argues that under the grievance procedure he was entitled to have the women's complaints resolved informally first, the Court does not agree.  The grievance procedure does not grant the person against whom a complaint is lodged the right to an informal resolution and does not require the employer to attempt to resolve a problem informally first.  The grievance procedure simply defines the rights of a complaining employee by requiring a complaining

and that Defendant Griego hired a Caucasian person to replace Salazar as Chief Financial Officer. Plaintiff Salazar argues that this treatment is evidence of Defendants' ill will towards him. Plaintiff Salazar, however, presents no evidence that this treatment occurred or that the ill will existed because of discriminatory racial animus. To the contrary, Plaintiff Salazar sets forth facts from which a reasonable jury could conclude that Defendants' alleged treatment and ill will arose out of animosity regarding Salazar's employment decisions and performance. *See, e.g*, Pl's Mot. for Summ. J. Regarding § 1985 Claims at 2, ¶ 9) (Defendant Hassall "became upset with Plaintiff over the incident regarding Ms. Ortiz and accused Plaintiff of being hostile."); *id.* at 3, ¶ 17 (Defendant Hassall "became more upset with Plaintiff when Plaintiff prevented Hassall from hiring a job applicant without interviewing higher ranked applicants."); *id.* at 3, ¶ 16 (Defendant Spencer was angry with Plaintiff Salazar over former ASD Director Ortiz and said "[t]his isn't over" as he was leaving Salazar's office). Because Plaintiff Salazar has set forth no evidence that Defendants acted out of racially discriminatory animus, the Court grants Defendants' motion for summary judgment on Salazar's Section 1985 conspiracy claims against Defendants Spencer, Hassall, and McOlash.

      B.    <u>Plaintiff's Motion</u>.

Plaintiff Salazar moves for summary judgment on his 42 U.S.C. Section 1985 conspiracy claims. Because the Court already has held that Plaintiff cannot establish discriminatory racial animus, the Court denies Plaintiff's motion for summary judgment on his Section 1985 claim.

---

employee to first lodge an informal complaint and allow the employer to attempt to resolve the complaint informally. Defendants therefore did not violate the grievance procedure when they reprimanded Plaintiff Salazar without first giving him an opportunity to resolve the complaints of the women against him informally.

VI.    Plaintiff's Motion for Summary Judgment on Plaintiff's Section 1986 Claims and Plaintiff's
       Motion for Leave to Amend the Complaint.

       In its Memorandum Opinion and Order dated January 29, 2007, [Doc. No. 207], the Court

dismissed without prejudice Plaintiff Salazar's Section 1985 claims in Count I against Defendants

Jimenez, Fields, and Burch on the ground that the Amended Complaint failed to allege any acts of

Defendants Burch, Jimenez, and Fields "in furtherance of a conspiracy." *Cf. Tilton*, 6 F.3d at 686.

As a result, Plaintiff Salazar's Motion for Summary Judgment on his Count I claims against

Defendants Jimenez, Fields, and Burch in their individual and official capacities is moot, and the

Court therefore denies the Motion.

       On February 9, 2007, Plaintiff Salazar filed a Motion for Leave to Amend the Complaint.  In

this Motion, Plaintiff Salazar seeks leave of court to amend his complaint to properly plead a Section

1986 claim against Defendants Jimenez, Fields, and Burch.[14]  Defendants oppose the Motion to

Amend, arguing that they will be prejudiced by the proposed amendment because they have not

conducted discovery on a Section 1986 claim and the discovery period has closed.

       As an initial matter the Court notes that although Plaintiff Salazar does not specifically

reference 42 U.S.C. Section 1986 in his First Amended Complaint, the facts alleged in that Complaint

are sufficient to put Defendants Jimenez, Fields, and Burch on notice that Salazar intended to assert

a Section 1986 claim against them.  The Court need not determine, however, whether, given these

facts, allowing Plaintiff Salazar to amend his complaint would prejudice Defendants because the

---

[14] Plaintiff Salazar maintained in his opposition to the Motion to Dismiss Count I that
"Defendants Fields, Jimenez, and Burch [were] sued in Count I pursuant to Title 42 U.S.C. § 1986,"
The Court noted in its January 29, 2007, Memorandum Opinion and Order that the Amended
Complaint does not mention a Section 1986 claim.  The Court therefore concluded, "If Plaintiff
Salazar wishes to amend his Complaint to add a Section 1986 claim, he must do so by motion
consistent with this Court's rules."

Court denies Salazar's Motion to Amend on different ground.

Federal Rule of Civil Procedure 15(a) governs circumstances where parties seek to amend a complaint after a responsive pleading already has been filed. Such leave "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). While the rule generally allows amendments, the most notable exceptions to that rule include a showing of undue delay, undue prejudice to the opposing party, or futility of the amendment. *See, e.g.*, *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Scott v. Hern*, 216 F.3d 897, 906 (10th Cir. 2000); *Castleglen, Inc. v. Resolution Trust Corp.*, 984 F.2d 1571, 1585 (10th Cir. 1993). "A court properly may deny a motion for leave to amend as futile when the proposed amended complaint would be subject to dismissal for any reason, including that the amendment would not survive a motion for summary judgment." *Bauchman v. W. High Sch.*, 132 F.3d 542, 562 (10th Cir. 1997) (citations omitted).

Title 42 U.S.C. Section 1986 provides a cause of action against "[e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 . . . , are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refused to do so, if such wrongful act be committed." "In order to maintain a cause of action under § 1986, [a] plaintiff[] must show the existence of a § 1985 conspiracy. . . . Thus, if the elements of the § 1985 conspiracy are missing, a § 1986 cause of action is properly dismissed on summary judgment." *Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d Cir. 1994).

To succeed on his Section 1986 claim, Plaintiff Salazar must show the existence of a Section 1985 conspiracy. The Court, however, already has granted summary judgment in Defendants' favor on Plaintiff Salazar's Section 1985 conspiracy claims on the ground that Salazar has failed to set forth any evidence of racially discriminatory animus. *See supra* § V.A.2. Because Plaintiff Salazar cannot

show the existence of a Section 1985 conspiracy, his Section 1986 claim must fail.  Accordingly, any amendment of Plaintiff Salazar's complaint to add a Section 1986 cause of action would be futile. The Court therefore denies Plaintiff Salazar's Motion to Amend on this ground.

VII.    <u>Cross-Motions for Summary Judgment on Plaintiff Salazar's Title VII and NMHRA Claims</u>.

      A.    <u>Defendants' Motion</u>.

This Court has held that Plaintiff Salazar exhausted his Title VII and NMHRA administrative remedies with respect to two employment actions:  (1) his January 2003 unsatisfactory evaluation, and (2) his alleged March 2003 demotion.  Defendants maintain that Plaintiff Salazar cannot withstand summary judgment on these claims because he cannot establish a prima facie case.  A plaintiff may prove intentional discrimination in one of two ways:  directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.  *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005).  A plaintiff relying upon the indirect method of proving discrimination bears the initial burden of making a prima facie case of discrimination.  *Young v. Dillon Cos.*, 468 F.3d 1243, 1249 (10th Cir. 2006).  Upon establishing a prima facie case, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action that is not facially prohibited by Title VII.  *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004); *Young*, 468 F.3d at 1249.  If the employer is able to do so, the burden then shifts back to the plaintiff to come forward with evidence showing that the proffered reason is a pretext for discrimination (*i.e.*, an attempt to obscure racial discrimination).

One element of a prima facie case is that a plaintiff was satisfactorily performing his or job. *Id.*  The Court concludes that even if Salazar could meet his initial burden of establishing a prima

facie case of discrimination, he nonetheless could not withstand summary judgment. Because the Court concludes that Defendants have articulated legitimate non-discriminatory reasons for their employment decisions, Plaintiff Salazar must come forward with evidence showing that the proffered reasons are a pretext for discrimination. Plaintiff Salazar cannot satisfy this burden.

The Court already has held that Plaintiff Salazar has not set forth any specific evidence of racial animus. *Supra* § V.A.2. The Court likewise concludes that Plaintiff Salazar has failed to present any evidence that Defendants' proffered reasons for their employment actions were a pretext for discrimination based upon national origin. Plaintiff Salazar argues that the complaints filed by four employees at the NMDFA were a pretext for terminating him on May 23, 2003, and that Defendants' unsupported conclusory allegations in his January 23, 2003, appraisal (*e.g.*, that Salazar was uncooperative, insubordinate, and blamed others) were a pretext for their negative appraisal and their decision to demote him in March 2003. Plaintiff Salazar also argues that he completed the Fiscal Year 2002 audit on time and with an unqualified opinion, and that Defendant Cabinet Secretary Fields stated Plaintiff Salazar's job performance on the audit was "reasonable." This evidence, however, does not demonstrate that Defendants' proffered reasons for Plaintiff Salazar's negative evaluation or the discipline based upon the women's complaints were a pretext for discrimination *based upon Salazar's national origin*. Because Plaintiff Salazar has failed to satisfy his burden of setting forth specific evidence of pretext based upon racial discrimination, the Court grants Defendants' motion for summary judgment on Plaintiff's Title VII and NMHRA claims.

B.    Plaintiff's Motion.

Plaintiff Salazar moves for summary judgment on his Title VII and NMHRA claims. Because the Court already has held that Plaintiff Salazar cannot satisfy his summary judgment burden of

57

demonstrating that Defendants' proffered reasons for their employment decisions were a pretext for discrimination based upon Salazar's national origin, the Court denies Salazar's motion for summary judgment on his Title VI and NMHRA claims.

## CONCLUSION

For the foregoing reasons, **IT THEREFORE IS ORDERED** as follows:

(1)    Plaintiff Salazar's Unopposed Motion for Leave to File Supplemental Response to Defendant's Motion for Summary Judgment Nunc Pro Tunc, filed February 9, 2007 **[Doc. No. 210]**, is **GRANTED**;

(2)    Plaintiff Salazar's Motion for Leave to Amend the Complaint, filed February 9, 2007 **[Doc. No. 211]** is **DENIED**.

(3)    Defendants' Combined Motion and Memorandum in Support of Motion for Summary Judgment, filed October 26, 2006 **[Doc. No. 181]**, seeking dismissal of all of Plaintiff's claims is **GRANTED**; Plaintiff Salazar's claims are dismissed in their entirety;

(4)    Plaintiff Salazar's Motion for Partial Summary Judgment Regarding Section 1985 and Section 1986 Claims, filed October 26, 2006 **[Doc. No. 180]**, is **DENIED**;

(5)    Plaintiff Salazar's Motion and Memorandum of Law for Partial Summary Judgment Regarding Discrimination and Retaliation, filed November 2, 2006 **[Doc. No. 187]**, is **DENIED**;

(6)    Plaintiff Salazar's Motion for Partial Summary Judgment Regarding Due Process Claims, filed November 2, 2006 **[Doc. No. 188]**, is **DENIED**; and

(7)    To the extent that Plaintiff Salazar's Motion for Partial Summary Judgment Regarding Section 1985 and Section 1986 Claims, filed October 26, 2006 **[Doc. No. 180]**, Defendants' Combined Motion and Memorandum in Support of Motion for Summary Judgment, filed October

26, 2006 **[Doc. No. 181]**, Plaintiff Salazar's Motion and Memorandum of Law for Partial Summary Judgment Regarding Discrimination and Retaliation, filed November 2, 2006 **[Doc. No. 187]**, and Plaintiff Salazar's Motion for Partial Summary Judgment Regarding Due Process Claims, filed November 2, 2006 **[Doc. No. 188]**, move for summary judgment on any claims already dismissed by this Court, those motions are **DENIED**.


Dated this 28th day of March 2007.


**JUDITH C. HERRERA**
**UNITED STATES DISTRICT JUDGE**